Case number 24-5243, Jawan N. Tarquinii appellate v. John Phelan, Secretary, U.S. Department of the Navy. Ms. Tarquinii for the appellant, Mr. Harris for amicus curiae for appellant, and Mr. Sompot for the appellee. All right, you may approach and begin when you're ready. Good morning. Good morning. Good morning, your honors. May it please the court. My name is Jawan Noel Tarquinii, and I am the appellate appearing pro se. The district court granted summary judgment without examining whether the process that led to my termination was constitutionally sound. The record shows it was not. In July 2014, I reported discriminatory treatment and hiring violations against Carlos Saldana and his HR office in Okinawa, Japan. No one ever investigated my complaints. Fourteen months later, Saldana was assigned to investigate me for the same type of hiring violations I reported against him. At the close of that investigation, Lieutenant Colonel Scott Manning signed a document on October 30, 2015, concluding I was guilty based on that investigation that Saldana conducted. That document, along with the complete file, was withheld from me. As a disabled veteran, I was immediately removed and barred from the base overseas with no access to medical care. Two weeks later, Manning, who had already concluded I was guilty, supervised my only access to the evidence against me. It was time-limited partial review of a partial file with no copies allowed inside of a police station under armed guard. Manning and Saldana then directed and advised Colonel Boucher, who decided my appeal. My first-line supervisor, Robert Johnston, proposed a termination, signing a hiring violation, issued me paperwork immediately to out-process from the base, and then publicly gave me a professional endorsement that exact same night. During the termination meeting, he was in tears, and he told me five times that I didn't deserve it, that he was forced, and that I should fight it. Manning was present at that meeting as well. John Iwonic, my second-line supervisor, signed my termination, changing the reason from hiring violation to employment misconduct. Then he gave me a glowing reference to the Department of Justice U.S. Attorney's Office. He testified that he had no reason but to give me a positive review. Ironic. The reasons for my termination shifted multiple times across multiple documents, from hiring to employment to poor performance to involvement in a process the government's own attorney, Jody Devine, admitted was within policy. In 2024, nearly 10 years later, I finally received the complete investigative file that they relied on in 2015 to terminate me. The staffing specialist who actually performed the work testified clearly that the directions came from Cheryl Harkness, who was under the exact same investigation for the same conduct, not from me. The investigation file does not just fail to prove what they accused me of. It proves the opposite, that I wasn't involved. Colonel Boucher, the official who decided my appeal, testified that he remembered no evidence except the one statement from Cheryl Harkness. I never saw the statement, and I never got to question her. Boucher's own decision letter cited employment misconduct regarding both my husband and my brother as his basis for termination. But when he testified, he said that the decision was about hiring, not employment misconduct at all. Hiring. So when asked about my brother, Boucher said, I'm guessing now, so I don't know. My brother was included in the charges to create like an appearance of a pattern, but Boucher could not remember a single piece of evidence to support it because there was none. The district court affirmed summary judgment in a process that was riddled with contradictions, ex parte communications, shifting charges with no notice or clear opportunity to respond, conflicted advisors, and a decision resting entirely on a statement from a witness who was under the investigation for the same conduct. Manning and Saldana had already concluded I was guilty. Boucher depended entirely on their direct counsel and direction. So the outcome was decided before it even reached his desk. There was no neutral process, and that is what I'm asking this court to correct. Thank you. Mr. Quinney, the inspector general's report is the reason that your former employer gave for the discharge, but your case before us is a case of employment discrimination. The deciding officials, Mr. Johnson and Mr. Iwanek, in the record, they say they relied on the inspector general's report to make the decision that they needed to terminate your employment. Can you point us to anything in the record that shows they did not actually believe in the validity of they didn't believe in the validity of the inspector general's conclusions?  So the day of termination, I was corresponding with headquarters and informing them of everything that was going on and everything that was happening contemporaneously. And I let the headquarters know, the director there, Dennis Ray, that my supervisor, Robert Johnson, was crying multiple times. He said that I did not deserve it. He said that it was not fair and that I should fight it. And further speaking with him, he said that Mr. Iwanek thought the same thing, that I did not deserve it, that I should fight it, and that it was not warranted. Then Mr. Johnson came and he gave me the reference that same night, that positive reference, and then Mr. Iwanek gave me a positive reference to a promotion after that. So if they honestly believe that I created misconduct, then they would not have referred me as adamantly that they did after the fact. And as far as the investigatory file, I was only given a partial review of that. I didn't see the entire file until almost 10 years later. So the file that they so-called were using to support the investigation, I didn't get a copy and I didn't see it myself for almost 10 years later. I only had parts of the file over the course of 10 years that I did not receive. And that's what they said that they depended on the day that they terminated me. I didn't have access and I had no idea that any of that other file even existed until 2024. But I think that I heard you say, I want to make sure that I understand you correctly, that if one looks at that file, one would find that it does not substantiate the grounds for the termination. Is that what you said earlier? That is correct. And why is that? Direct me to what, if I were to read that file, what should I look for that would say that this is a sham? That's an excellent question. Because I still don't know to this day the reason of the termination as stated in the termination documentation. So for example, Mr. Iwanek on the termination letter, he says that it's in reference to, references that it's at the top of that termination document itself. But it doesn't list what those references are. It doesn't list anything. So I don't know what inside of that specific document that they were referencing. All I do know is that when I finally did receive the documents and I saw the whole file, inside of the document itself, there is a testimony and a statement from Kaori Yakahari, who was the staffing specialist who actually performed the duties. She testified and she stated very clearly that the direction came directly from Cheryl Harkness, who was also underneath that exact same investigation, not from me. So that's their own investigation that says very clearly where the direction came from, which has nothing at all to do with me. So that's in their investigation specifically. All right. And you have counsel for Amicus who's agreed to argue on your behalf. Yes. So if you want to, have you reserved time for rebuttal? Yes, I did. All right. So we'll hear from you after we hear from defendant. But we'll hear now from Amicus. Good morning, Your Honors. Ben Harris is the court-appointed amicus in support of the appellant. And I'd like to reserve two minutes. for rebuttal. The district court committed two fundamental errors, each of which warrants reversal. First, the district court failed to analyze whether Tarquini could prevail under a motivating factor theory of discrimination, which provides for liability under Title VII, even where other factors motivated an adverse employment action. There's voluminous record evidence showing discriminatory animus by the key decision makers in this case, Johnston and Awanak. And that is enough to get past summary judgment under a motivating factor theory. Second, the district court committed fundamental errors in analyzing the but-for causation theory of liability. Specifically, the court held Tarquini to an impermissibly high standard. It failed to recognize what this court said in Potts, that there could be multiple but-for causes of a given event. And the court wrongly discounted evidence of discrimination as isolated and occurring a significant time before Tarquini's termination. The record flatly contradicts that reasoning, and this court should reverse. I'd like to start, Your Honors, with the motivating factor theory of discrimination. The government's primary argument is that Tarquini waived or forfeited that argument by failing to present it to the district court. I think there are a few reasons why this court should reject that waiver or forfeiture argument. The first is that if you look at Tarquini's summary judgment briefing, she specifically invoked discrimination as an animating rationale for the adverse employment action. That's at JA 567 to 570. And in her declaration as part of summary judgment at JA 654, Tarquini explained that it was due to discrimination and bias against her on account of her race and her sex, among other things, that the Navy terminated her employment. Now, I think that's enough at summary judgment by a pro se litigant to make the district court aware of the causal connection between discrimination and an adverse employment action. If you look at the statute, subsection A says that when discrimination or race or sex is a cause of an adverse employment action, that's an unlawful employment practice. But subsection M says that it is an unlawful employment practice when a motivating factor plays a part in an adverse employment action. Well, what the statute is saying is that to meet that causation element, you can advance a motivating factor theory of liability. So the district court was aware that Tarquini was arguing a causal connection, and a motivating factor theory of liability is a lesser evidentiary burden to show liability under Title VII. By arguing pretext in her summary judgment briefing, Tarquini necessarily advanced the theory that race or sex was a motivating factor. That's an argument that any summary judgment motion will encompass both theories. I think under ordinary circumstances, Your Honor, when a litigant is saying race or sex caused my adverse employment action, caused my firing, a subsidiary argument there is that race or sex was a motivating factor. It contributed to the firing. Now, the but-for-causation standard theory, and this is what the Supreme Court says in Bostick, it's a greater evidentiary showing, and it can get you additional relief down the line at trial. I mean, maybe as a matter of spitballing, but it's just hard to reconcile with how Title VII cases are litigated. These are very distinct theories of liability. This court said in Fogg, Your Honor, that a plaintiff pursuing a Title VII claim can, of course, use evidence of pretext in the McDonnell-Douglas framework to show that race or sex or any other impermissible characteristic was one motivating factor contributing to an adverse employment action. So, I think in practice, what you're asking in summary judgment is, can the plaintiff, could a reasonable fact finder find liability under Title VII? And the statute clearly articulates that a motivating factor theory of discrimination gets you the liability. It's just a lesser evidentiary showing than a but-for cause of liability. So, but I'm going to assume for the moment that you're not saying that any litigant, counseled or not, who raises a but-for claim under Subsection A should be presumed necessarily to have raised a motivating factor claim under Amized. I take you to be saying that we have a pro se litigant here and that the district court therefore, looking at this evidence in this case, should also analyze motivating factor. Is that correct or no? That's right, Your Honor. I don't think the court needs to articulate a hard and fast rule that applies to every litigant. And I think Your Honor is exactly right. We have a pro se litigant. She put forward in her summary judgment briefing that discrimination was a cause of her adverse employment action. She specifically invoked discrimination multiple times in the record in summary judgment. And she didn't expressly disclaim a motivating factor theory of liability. In fact, she didn't clearly pursue either route of liability. She just argued discrimination was a cause or an element, was behind the action. But I'm trying to understand why the district court would have had to go through that in this case precisely because she's pro se. It seems to me the big benefit of finding of a motivating factor, at least, but for cause is not supported, which is what the district court thought. Why would this district court in this case go on to say, but discrimination was a motivating factor where there's no attorney's fees that can be won. There's, you know, any declaratory relief would not sort of clean off her record in regard to the reliance on the inspector general report. There's no back pay or compensatory damages available under a pure motivating factor analysis. So why would it be incumbent on the district court in a case like this to also consider that alternative argument? Well, Tarquini asked for various forms of relief in her initial complaint. This is a J19-20, including appropriate injunctive and equitable relief. And it's possible that even under a motivating factor theory, she could get, A, a declaration that she was the subject of unlawful employment discrimination. B, she could get some form of injunctive relief. It might look like training for her former supervisors. It might look like a letter explaining what happened to future employers. There may be certain kinds of relief available to even a pro se litigant and even on this complaint and in this case under the specific relief that Tarquini asked for. And I think this question gets to the purpose of subsection M. What the Supreme Court said in Price Waterhouse is that once you can show that the employer would have taken the adverse employment action anyway, that's a complete defense to liability. And Congress reverses, Congress undercuts Price Waterhouse and says no in 1991. It adds subsection M. And it says illegal employment discrimination is a problem. Which is why even where race or sex or another impermissible characteristic plays even a small part in an adverse employment action, that is illegal under Title VII. And that's part of the purpose of the motivating factor theory of discrimination. To vindicate a plaintiff's rights under Title VII and to ensure that workplaces, especially workplaces controlled by the United States government, are free from illegal discrimination. On the Buford causation, the district court said that there's just, there's not enough evidence to send to a jury on that. And in particular, that there really isn't a nexus between the kinds of sex-based comments and differential treatment based on race and sex that Ms. Tarquini puts in evidence. And what's your response? You argue that a Buford causation should have been sent to the jury. I think there are a few fundamental errors with the district court's reasoning as to Buford causation. And the first two relate to how the district court characterized the evidence in this case. The district court didn't catalog or explain the evidence, the voluminous evidence of discriminatory animus by the two decision makers. And instead, it characterized the remarks as quote, unquote, isolated and occurring a significant time before the adverse employment action. I think the record directly contradicts both of those rationales. First of all, the evidence was voluminous. It showed discriminatory comments and conduct occurring throughout the time of Tarquini's employment up and through November of 2015. Comments relating to her being bossy, emotional in the workplace, comments by both supervisors asking Tarquini whether it was quote, unquote, that time of month, comments relating to her weight and her appearance, making Tarquini apologize to her white counterparts, comments that Tarquini was bossy at a company picnic. I mean, these are comments that are occurring throughout the time of Tarquini's employment and are not isolated or stray remarks. I thought that in a way the most clearly sex-based were the that time of month comments, which then in context relate to the bossy and emotional comments. Did she press those before the district court? Because it struck me the district court did not mention, at least I'm not recalling the district court having mentioned those comments in its opinion. You're right, Judge Peller, that the district court didn't mention the comments, but Tarquini did put the comments in her summary judgment briefing and explained to the district court that she was subject to sex and race-based discrimination, referring to the comments and conduct that she then elaborates on in her declaration in support of summary judgment. So the district court is on notice that all of these comments and conduct happened during the course of her employment. She's referencing that in her summary judgment briefing and in the declaration. But you're right, the district court does not catalog those comments or acknowledge that they happened. It characterizes them as isolated, which they were not, and it characterizes them as occurring a significant time before the adverse employment action. But there are comments and conduct occurring up through November of 2015. For instance, J627, in October of 2015, a month before the termination, Johnston told Tarquini she was too bossy at a company picnic. Between April 2014 to November 2015, the same month when Tarquini is terminated, her boss has treated her as inferior to her white counterparts when she had done nothing wrong and treated her as subservient. That's J606. Do you have any more specifics on that? There are more specifics in the declaration, Your Honor. There are at J606 through November 2015, quote, I was frequently instructed by Mr. Johnston to alter my tone, appear less emotional in conversations with others, and to avoid acting as if it was that time of month. That's through November of 2015. So if we're talking about the district court's analysis under the but-for causation theory of a nexus between the discriminatory comments and the adverse employment action, the two primary bases, the district court and vote, isolated and occurring at significant time before the adverse employment action, don't stand up to the record evidence summary judgment. And do Mr. Ioannouk or Mr. Johnston deny ever having said anything about that time of month or ever having described her as too emotional or too bossy? They do. In their deposition transcripts, they deny having made the comments. Now, of course, the court views the evidence summary judgment in a light most favorable to Tarquini, and that's a classic question for the fact finder, whether those comments were actually made, whether they engaged in that kind of conduct, and who's to be believed.  You don't have citations where they deny that, do you? I don't, Your Honor, but I can address them on rebuttal where they deny doing that. I think the other error to highlight as part of the but-for causation analysis is the district court's conclusion that none of the comparators had supervised, well, the district court said two of the comparators had the same supervisors as Tarquini, but it ignored the evidence as to Gary Holzapel, and I think that's relevant comparator evidence and summary judgment. Tarquini alleges that Holzapel engaged in misconduct and covered up sexual assault allegations in the workplace, yet was not fired. The district court appears to assume that Ioannouk and Johnston didn't supervise Gary Holzapel, but JA-206 has the organization chart for MCCS, and it shows that Holzapel was directly under their supervision. So that's just another error looking at the factual record that appears to have animated the district court's nexus analysis under but-for causation. Do you have anything to add to what Ms. Tarquini said about why a reasonable fact finder could find that the decision makers didn't believe the Inspector General report? As far as I can tell from looking at the record, Your Honor, I don't have anything to add to Ms. Tarquini's argument about that, but I think what's important to understand is that in a motivating factor theory of discrimination, it is not on a Title VII plaintiff to disclaim or disprove the employer's non-discriminatory rationale for an adverse employment action. I'm talking about with respect to the but-for argument or the pretext argument. I would say the same thing is true even in a but-for case, Your Honor. This court acknowledged in Potts, the Supreme Court said in Bostick, there could be multiple but-for causes of a given event, and this court said in Holcomb, a Title VII plaintiff has multiple routes to liability. One is disproving or casting doubt on an employer's non-discriminatory rationale, but a plaintiff can also offer evidence of other evidence of intentional discrimination, and it's entirely possible that there could be two but-for causes of a termination. There could be a non-discriminatory reason that stems from an investigation or some report of wrongdoing, and race or sex or another impermissible consideration could also be a but-for cause. I appreciate that as a description of the doctrine, but as applied in this case, I'm not sure that I have at my fingertips the narrative of how both could be a but-for cause. If Ms. Tarquini had not been a Black woman but this IG report had come out about that man's conduct, he would not have been fired. What evidence do we have that would raise a jury issue with respect to your more than one but-for cause approach? I think the record shows that there were a range of options available to the key decision-makers in this case, and that the investigative report didn't inevitably lead to Tarquini's firing, and I think it's important to understand this because it really shows how race or sex could be a but-for cause. At JA-207-221, that's the manual that announces the Navy's policy about first-time offenses, termination. There's a range of options for first-time offenses. It goes from reprimand on the one end of the spectrum to termination on the other. In the investigative report in this case- What page was that? I'm sorry. That was JA-207-221, Judge Wilkins, and the investigative report in this case did not recommend a specific action. At JA-1421, the report forwarded to Johnston and Awanak, quote, for consideration and appropriate action. And if you turn to their explanations for why they fired Tarquini, they did not rely solely on that investigative report. What Awanak says in his declaration at JA-314 is that he read the investigative report very carefully but did not terminate Tarquini based solely on the IG's conclusions. He said, quote, I made my own determinations based on the evidence that the IG had collected as well as my own knowledge of Mrs. Tarquini's actions. And at JA-2156, which is MCCS's letter in response to Tarquini's internal appeal to Colonel Boucher- You said 426? Sorry, this is JA-2156. I may have misspoken. No, no. Go ahead. Awanak said he, quote, also considered his personal knowledge of Mrs. Tarquini's actions in the previous year. So the record evidence doesn't show that the investigative report somehow bound Johnston and Awanak to firing Tarquini. In fact, the report gave them a range of options that they could take in response to the findings that were substantiated by Saldana and Hodges. And if it were the case that Awanak and Johnston felt bound to terminate Tarquini based on the report, there would be no explanation for why they considered other factors besides the report in making that final determination. So I think that's what the record shows in terms of what the decision makers were thinking at the time they fired Tarquini. And then I think you add in the comparator evidence in the but-for analysis. And when you have a white male comparator, Gary Holstaple, who is alleged to have been engaged in covering up sexual assault misconduct inside the workplace, supervised by the same key decision makers, and who isn't fired for conduct of a comparable seriousness, that's, I think, how you get to there's a fact finder could conclude that but for Tarquini's race or sex, she would not have been fired. You're not pointing to Cheryl Harkness as a comparator. I believe that Mr. Tarquini avers somewhere that she engaged in nepotism but faced no disciplinary action. Your Honor, the organizational chart, I think, is key there in the key decision makers with respect to Harkness. So that's why I focused on Gary Holstaple. But, you know, I think Holstaple is the best comparator, not necessarily the only comparator, just the one that I highlighted. Thank you. And did you also reserve time for rebuttal? I did. All right. We'll hear now from Mr. Sampat. Good morning, Your Honors. May it please the Court, Chairman Sampat, on behalf of the Secretary of the Navy. Congress thought nepotism was an evil unto itself, and it codified that evil in statute. The standard of ethical conduct is governed by federal regulations. Mr. Tarquini, as the Chief of Human Resources, decided to upend that theory and upend civil service and offended the very notion of it by engaging in nepotism and influencing the hiring of her husband and her brother. Her conduct was severe enough that it warranted the Office of the Inspector General to investigate the allegations. It substantiated those allegations. Then Mr. Johnston and Mr. Iwanek, as Ms. Tarquini's supervisors, reviewed the report, decided to terminate her because she was the Chief of HR. If that is not a legitimate, non-discriminatory reason for her termination, I don't know what is. What's your response to what Ms. Tarquini said at the podium today, that she didn't have access to full materials until 10 years later and that looking at them now, it appears that someone else was responsible? So, Your Honor, the district court rejected those theories based on the facts in the record that showed that Ms. Tarquini had actually reviewed the reports and had information at her fingertips. Obviously, the record, I will admit, is not 100% clear with the volume of it, but she did testify, and it's her own statements that say she did review the report. I'll just start with the motivating factor theory very quickly. I know my friend on the other side, my amicus friend on the other side, advanced that theory. I will say it is waived, despite the fact that Ms. Tarquini proceeded pro se below. I think to say that the district court— Forfeited, not waived. Oh, sorry. Excuse me. Forfeited, yes. I apologize, Your Honor. It is forfeited given this court's decision in Ponce that puts the burden on an employee to raise that theory at summary judgment. She had an obligation to raise it. She didn't, and it is therefore waived. We have, not in this identical context, but in various contexts, we have case law that it is the court's responsibility, even when something is not raised, and particularly by pro se counsel, when they're ruling on the merits, the ultimate merits. I mean, we have cases about local Rule 7 where motions can be granted as conceded, and we said, no, no, no, that's a dispositive motion. The obligation of the court is to get the law right. Why would we not apply a similar analysis here? So I'm going to quote the Second Circuit in Davis v. Kelly. I think it aptly points out exactly why. A court need not act as an advocate for pro se litigants. To impose that obligation on district courts to think of theories that a pro se plaintiff may advance would put the district court in the advocacy bucket and not as an independent arbiter of the case before it. The courts below have said numerous times that pro se plaintiffs can waive and forfeit arguments if they're not raised. I don't see much difference here, and there was nothing in the summary judgment motion that would have put the district court on notice that Ms. Tarquini was indeed advancing a motivating factor theory. But we have, for example, in one of the cases, Winston v. McLean, which is at 843 F3rd 503, and if you look at 506 to 507, we hold after the district court says local rule 7 applies, which is that a motion was not contested. So that's a forfeiture, basically. A party has forfeited. And we said, well, you know, no, that the court may only grant summary judgment if there's no genuine issue of material fact in dispute and the movement is entitled to judgment as a matter of law. And a panel of this court said these standards cannot be satisfied if the district court simply grants judgment as conceded or as forfeited when the nonmoving party fails to meet a deadline. So why doesn't similar analysis apply here to a pro se who hasn't articulated as such? I mean, here she's given the court more to work with than in the typical case of forfeiture. The material is, as you heard Mr. Harris explain, it's really the same bucket of evidence. She's saying discrimination. My firing was affected by discrimination. Why isn't that something that she raised? She didn't say I'm only raising before cause, but I'm challenging discrimination. So, Your Honor, in her opposition to summary judgment, understanding that she raised that her termination was motivated by animus, but I think Judge Katz has hit the nail on the head during his colloquy with Mr. Harris, which is that inviting any other rule would effectively turn every opposition to summary judgment as one that court has to consider all the theories. This is a theory that is nested, you know, right within any theory of discrimination in employment. Was it a but-for cause? Was it a motivating factor? I mean, it's not like, oh, does she also have an equal protection claim or does she also have a tort claim. It's pretty, this is a uniquely proximate and, you know, family in the family of the claim that she, I mean, in fact, maybe this is the main claim that she brought because she doesn't really parse it out separately. So, what I would say, Your Honor, though, is basic party presentation principles still have to apply. And she presented evidence of discrimination. She presented evidence of discrimination and has really put all her eggs in the basket of the but-for theory, saying that the termination is motivated by her membership in a protected class. She's fought the termination through her briefing in the district court. Through here, she's objected to the findings of the IG report. There's nothing in the record that the district court could have read to perceive Ms. Tartini as even related. At the administrative exhaustion stage, does the paperwork there distinguish between but-for and motivating factor, mixed motive, in the paperwork that someone has given as far as exhausting the claim? So, Your Honor, are you talking about the formal EEO complaint? Yes. I have it, but I don't recall seeing a field or anything of that sort that would say, are you proceeding under but-for or are you proceeding under mixed motive? And again, we're not disputing that a plaintiff can raise both. The reason I ask is that it seems to me that if when you're exhausting, there is no requirement to kind of exhaust both or to bring both to the attention at that level, doesn't that kind of cut against your argument? Because there's no way to know whether she exhausted both theories. And to the extent that the EEOC or whoever drafts those documents thinks it's relevant, they don't really think that it's relevant to direct the complainant to kind of distinguish between the two theories. Your Honor, I would just say Ponce says that an individual has the obligation to raise it, at least as a judge. That's what this court— That's a counsel. So you would hold her to the counsel standard. If we were to agree with Amicus that in ruling for summary judgment against a pro se plaintiff, the district court, in an employment discrimination case should consider both a but-for and a motivating factor analysis, why shouldn't we remand to the district court to do the analysis that the district court didn't do? Because, Your Honor, there's no evidence that— no disputed evidence that Ms. Tartini has pointed to that shows the nexus anyway. There still needs to be a factual connection between the adverse action, which is here, the termination, and her membership in a protected class. And she has not presented any evidence that would show that it was all protectable or that her membership in a motivated— sorry, her membership in a protected class is the reason for the termination itself. A reason. A reason. Yeah. So Mr. Harris talked about the range of statements going on over a long period of time that a reasonable jury might find events, attitude of sex and or race discrimination, even if you think the IG report was a but-for cause. How do you exclude that attitude toward this employee as a motivating factor? And I guess I would add in there the comparators. We have identification of people. I think the comparators in this case, maybe what's relevant, is who is sort of a middle-level manager, not are you under the exact same people, but people who have a responsibility. I mean, one of the things that was said when Ms. Tarquini was, you know, in defense of terminating her was, well, she was an HR person. She had to be exemplary. But then you have people in, you know, similarly important positions, negligently causing a loss to the Navy of $300,000 or causing a $175,000 merchandise deficiency or Mr. Holsopel, you know, engaging in unlawful conduct or suppressing corruption thereof. Why are those not also circumstantial evidence that this employee was treated worse? So, Your Honor, this court in Joyner said that comparator evidence needs to be nearly identical, and none of the individuals that I'm – For materially nearly identical. And what I'm saying is it doesn't have to be this – I mean, there's only one presumably position like the one that the plaintiff here held. And so you have to look at other kind of people with some responsibility over a function. So maybe it is nearly identical if somebody responsible for a function of, you know, inventory of merchandise causes a loss of $175,000 of merchandise. Maybe that is comparable to somebody in HR doing something in hiring that's considered highly irregular. I would say it's not, Your Honor, because, again, Ms. Tarquini is uniquely positioned to be in a place where she could influence hiring and firing decisions. That's the position that she's using, and it's not comparable to someone that has oversight over funds and things like that. Mr. Harris pointing to Mr. Halsopel, again, very different circumstances, different position where they're, of course, you know, assuming that those allegations and everything are true about Mr. Halsopel committing misconduct, they are incredibly different than what Mr. – So tell us what – give me some more granularity about what are the accusations against Mr. Halsopel, why in his position not comparable in seriousness? So my understanding about the allegations of Mr. Halsopel were that – The evidence against him. Yeah, was that he had used his position. He had not investigated sexual harassment. I don't recall in the record allegations about sexual assault. I know my friend mentioned that, but I don't recall that in the record. I could be wrong. But that he didn't properly investigate things. He may have mismanaged some funds. But, again, I would point to the fact that Mr. Harkini is the chief of – was the chief of HR. And his position? If Your Honor will give me one moment, I'll just look at the – He was the chief of MNFP? I think it was like something in funds appropriation. But, Your Honor, I think we're talking about a night-and-day difference between Mr. Harkini and Mr. Halsopel here. What about the statements? From time of the month and all that kind of stuff? I think – This seems like a kind of textbook case where the government has a really good reason for doing what it's doing, and plaintiff is not going to win on but for, but there's at least some evidence that the bad motive is in the air. This court has said that stray remarks aren't enough, and I think we need to be careful about imposing what almost would be a hostile work environment theory into – But it's not. There's an action here. The hostile work environment theory, the comments are creating the adverse action. Here we're just talking about what is the orientation of these supervisors toward this employee. And to say stray remarks, I mean, it wasn't just one sweetheart. This was a – She, at least as she would testify to, a litany of some really pretty sex-based and derogatory comments. I would say, Your Honor, I think the comments about this time of month obviously are sex-based. I'm not just – And not to be taken lightly. No. Very undermining. Your Honor, assuming those allegations are true, we obviously would say that we don't stand by them. They are inappropriate in the workplace, no question about it. But the question is whether or not Ms. Tarkini can point to any evidence that would connect those comments to the termination, and she hasn't. And that's the point, is that even under a mixed motive theory, she still needs some factual hook. None of those comments is from the direct supervisor, the second-line supervisor. They were. I think there were some comments from Mr. Johnson, some comments from Mr. Iwanek. I don't think that's – I would say for summary judgment, that's not enough. This court has said that it needs to be more than just a disputed fact. It has to be that a reasonable jury can infer discrimination. And just based on those comments, I don't think that a reasonable jury could infer, given the record. So when you say that a reasonable jury could not infer discrimination, you mean infer discrimination with respect to the challenged employment action, the challenged adverse action. That's what you're saying the standard is? Yes, to the termination. So if someone hypothetically, if the supervisor, you know, constantly refers to an African-American with the N-word, including, you know, days before terminating the person, but then terminates them based on, let's say, an inspector general report that they committed some wrongdoing, you would say that in that case there's not enough to go to the jury, even on a mixed motive theory, that racial discrimination had anything to do with determination? I wouldn't say that, Your Honor, only because I know this court's decision in IEC, you know, says that one use can be enough for a hostile work environment claim. I understand it's a different context and different claim. But I think there we have enough to have a causal connection. I'm sorry, which case? Because the N-word was used is what makes it enough? I believe the case is IEC AYISSI. Your Honor, that's what the panel said. Well, that's talking about hostile work environments. So let's say the N-word is not used, but it's just, you know, you people and a lot of derogatory things that a reasonable jury could say clearly show a hostility or animus towards someone because of their race, that there's various of those statements that are made, including up to about a week before the termination. And the termination is based on an inspector general report that found some other unrelated wrongdoing. So you're saying, so no N-word, but evidence that could be fairly construed as displaying racial animus. So you're saying in that case there wouldn't be enough to go to the jury? I think there could be, and I think that's this court's decision in Morris where there were more racially explicit comments being made, and then the court reversed a grant of summary judgment and sent it back. But, again, I think the key there was that this court saying there was a factual connection or there was evidence in the record that connected the comments to the actual adverse action at issue. And that's factual connection. I just read Morris yesterday, but the factual connection you're thinking of? So I believe there were different categories of evidence in Morris, and if Your Honor will give me, it was the multiple statements, and I'll just quote the court. It was the number and tenor of the racially charged comments that added the I'm not sure I see a difference there, though. I mean, there's number and tenor of remarks here that are, you know, gender explicit. There they were race explicit. There were derogatory statements about white girls or white boys by an African-American manager, and that was held to be enough of a link in that context, right? Yes, Your Honor. But, again, it was a connection of, you know, if I remember Morris also correctly, there was comments of replacing certain people and not giving Morris an opportunity to apply or not putting her in that position. Okay. That was not what you said. Yeah. Sorry. So that is the distinction here is, again, what juries interpret facts. They look at facts. That's what the standard is. And Ms. Tarkini is missing that. Thank you. Thank you, Your Honor. And if you want, you don't have to take rebuttal time, but if you want it, you're welcome to a minute. I'm not going to respond to you, but I will try to be as quick as I can. So the government said it again that the termination was based on hire, which differs, again, from the termination letter from Colonel Boucher and Mr. Iwonic, which both state employment. And to your point, you said is there a reason that, well, something around the government had justified reasons, but I have counted six different notifications of charges or six different changing reasons, I should say. Johnston's proposal said facilitated the hire. That's a JA-1386. Iwonic said regarding the employment misconduct, that's a JA-1029. Then Iwonic said it was based on poor performance and refusal to take responsibility, which isn't in any of the documents, and that's in JA-303. Then Iwonic told Boucher that it was for poor performance, inability to take responsibility, poor leadership, and management abilities. That's at JA-307. That's changing again. The fifth one was Jody Devine, the attorney, said that it was based on inappropriately involvement in employment. That's at JA-2170. And then the sixth time was Jody Devine saying the termination was based for involvement in a process that she admitted was within policy, and that was at JA-2175. That is six different times that the charges have changed. I have a question about the theory that we probed with Mr. Harris and Mr. Sompot. You now know from the brief that amicus has filed in support of your case that there's these two different theories, but-for causation and motivating factor. But-for causation, you have to show if the discrimination that your evidence, you know, if a jury were to believe your evidence, and you took away the discrimination, you wouldn't have been fired. That's the but-for causation. It's like if there were no discrimination, you would still be working there. But there's another lower standard that you can show you were subjected to discrimination if it was a motivating factor. It was in the mix. Even if it wasn't, you could take it away. It might still have happened. And the theory there, I think, as Congress is saying, we just don't want people to have to deal with discrimination that actually is affecting people in the workplace. But if you win on the easier to show, you don't get as much in terms of relief if you win as you would. So my question for you is-and the district court only considered whether in the absence of discrimination, would you still have the job? And he said no. No jury could find that you would still have the job even if all the things you say were discrimination never happened. He's saying that the IG report alone is responsible, right? Are you wanting to press a case in which you might get a finding that discrimination was a factor, but you would not be entitled to back pay, any other damages, attorney's fees, but you might get some kind of declaration that discrimination was in the mix. Is that something that you believe you are pursuing and want to pursue? Not to the-I mean, at all. So I just want to pursue a fair process. I feel as though I have never received a fair process from the beginning. He made comments as in don't grieve this like a little girl. I want to date you, kid. I love you, kid. You were talking about sexual harassment. There is a lot more in the case that I could explain in just a few minutes, but there's a lot more in the case that I reported to headquarters. It's all in the files, and in the files itself, the government deleted my files right before the hearing. They deleted all of my emails before the hearing itself. So there's just a whole lot there, but all of that was reported. It is contemporaneous in my notes. Headquarters also wrote their own notes to the facts as well. Everything is well-documented as far as the sexual harassment, as far as the discrimination, as far as the retaliation, and even hostile work environment. And I will say as far as Gary Hossoppel, Jason Gardner, Vincent Anderson, even when they were given the evidence for their file, they were able to review it in an open office or in their office. I was at a police station with armed guards, with Lieutenant Colonel Scott Manning right there with a partial file, so it was never accessed. So what the judge pointed to was my Facebook comment that said I had access. The access was a partial file that was never released over a 10-year period. So access is not the same as receiving the entire file itself. It's understanding the evidence that they claim they used to terminate me, if not for discrimination, if not because I had a disability and because I requested an accommodation, and they denied that a few weeks before. That is the temporal proximity of what actually happened to the employment decision that happened after that. It was all connected. Anything more? I know this is upsetting, and you're doing an admirable job as a non-lawyer in a very high-pressure kind of situation. So thank you for your argument. And we'll hear now from Mr. Harris. Just a few things, Your Honors. Judge Piller, before I forget, the portion of the awanic deposition that you were asking about is available at J768, and you were also asking whether Ms. Harquini put the statements about that time of month in front of the district court. It is paragraph 10 of her opposition to the government's motion for summary judgment. On the waiver point, the government concedes that Tarquini put her eggs in the basket of pressing discrimination in her briefing before the district court and its summary judgment. That includes a but-for theory of causation, and given the pro se circumstances of this case and the particular filings and arguments that Tarquini pursued below, a motivating factor theory of discrimination. If you look at JA907. Do you think same brief, same summary judgment brief, but in a counselled case, would the brief have been enough on the facts of the case to preserve both theories? I think the court doesn't need to get there, Judge Katsas. I know, but please answer. Yeah, I think it does. Good enough to preserve both? Good enough to preserve both. What the Ninth Circuit said in Stiegel on page 1071 of that case, although Stiegel does not expressly designate her case a mixed motives case, both her brief and the record reveal that it can be construed as one. I think that applies to this case in the briefing that Tarquini submitted to the district court. But again, I don't think the court needs to get there. I think you can find this because Tarquini was proceeding pro se below. And that's not inconsistent with, I think it's Ponce where we said somebody may want to disclaim that, and because they really want to press the jury to find but for or nothing, that that would be accomplished by a disclaimer on the part of the plaintiff? That's right, Your Honor. I think this gets at what Judge Katsas had in his colloquy with the government earlier. A litigant could disclaim outright a mixed motives theory and say I only want to proceed under a but for theory of causation. That would be waiver, not forfeiture. Here I think you have just the failure to specifically use the words motivating factor. But given that it's a lesser evidentiary standard, invoking discrimination repeatedly and arguing the causation standard is enough in a pro se filing. And the other thing I'd point the court to is JA907. This is Tarquini's letter of appeal to Colonel Boucher. It's in the record at summary judgment where she asserted, quote, Mr. Awanek's discrimination contributed to Ms. Tarquini's adverse employment actions in violation of Title VII. It is not as if, you know, at no point during these proceedings or during her time pressing this claim, she disclaimed mixed motive. In fact, it's just the opposite. On the nexus point, Your Honors, this court's precedents are clear that when the key decision makers exhibit discriminatory animus at or around the time of an adverse employment action in comments directed towards the Title VII plaintiff, that is enough to get past summary judgment. That's what this court said in Morris. That's what this court said in Mayorga. And I think this court's reasoning in De Jesus is particularly on point. There the court said a reasonable jury could treat evidence of a decision maker's broad-based racial animus or bias as corroborating evidence that such animus infected a particular employment decision. In fact, it is not unreasonable to doubt that an employer quarantines her animus or bias to day-to-day treatment of colleagues away from decisions about hiring, promotion, or termination. That applies directly to the circumstances here where the key decision makers are exhibiting a pattern of conduct in comments that exhibit discriminatory animus. Also on the nexus point, Your Honor, I think the key thing is that this is a classic case in which a fact finder should make the determination whether the discriminatory animus infected the adverse employment action. And for that reason, Your Honors, I also think if this court is going to send back the case on a mixed motive theory, it makes sense to vacate the BUD-IV causation theory that the district court analyzed. The reasons it invoked isolated comments a significant time before the adverse employment action do not hold up to the record. And a fact finder could find that BUD-IV, race, or sex, Tarquini would not have been fired, especially because the decision makers here talked about invoking other rationales behind the termination besides the investigative report. If there are no further questions, I ask that the district court's decision be reversed. Thank you. Thank you. And I want to recognize, thank you, Mr. Harris. You were appointed by the court to act as amicus for the appellant in this case, and the court thanks you very much for your assistance. You're welcome. The case is submitted.
judges: Pillard; Wilkins; Katsas